IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FELIX CORDOBA,

     Plaintiff,                         No. CIV S-10-0558 EFB

     vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.                  ORDER

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties' cross-motions for summary judgment motions are pending. For the reasons discussed below, the court grants plaintiff's motion, denies the Commissioner's motion and remands the case for further proceedings.

I.    BACKGROUND

        Plaintiff, born July 29, 1960, formally applied for DIB on January 30, 2004, alleging that he had been disabled since December 3, 2003. Administrative Record ("AR") 12, 18, 574. Plaintiff's application was denied, and he appealed the decision. *Id.* at 574. A federal district court remanded the case for further proceedings. *Id.* On remand, a hearing was held before administrative law judge ("ALJ") Peter F. Belli on August 24, 2009. *Id.* at 574, 582. Plaintiff

1

was represented by counsel at the hearing, at which he and a vocational expert (VE) testified. *Id.* at 574.

The ALJ's March 2, 2010 decision found that plaintiff was not disabled from the alleged onset date of disability through the date of the decision.[1] *Id.* at 574-82. The ALJ made the following specific findings:

> 1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.
>
> 2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of December 3, 2003 through this date last insured of December 31, 2007 (20 CFR 404.1571 *et seq.*).
>
> 3. Through the date last insured, the claimant has the following severe impairments: bilateral carpal tunnel syndrome, bilateral hand osteoarthritis, posttraumatic left median neuropathy, right knee Baker's cyst, right shoulder impingement syndrome, major depression, and posttraumatic stress disorder (20 CFR 404.1520(c)).

***

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.* Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits under both programs. *See* 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 and 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

2

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

***

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he was limited to lifting and carrying from 5 pounds frequently to 10 pounds occasionally in the right hand, no climbing of ladders, ropes or scaffolds, occasional stooping, crouching, crawling, and kneeling, and frequent fine and gross manipulations. Additionally, the claimant was moderately limited in his capacity to interact appropriately with the public, respond appropriately to work pressures in a usual work setting, and to changes in routine work settings.

***

6. Through the date last insured, the claimant was capable to performing past relevant work as an electromechanical technician. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

***

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from December 2, 2003, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(f)).

*Id.* at 576-81.

The ALJ's decision became the final decision of the Commissioner of Social Security.

*Id.* at 571-73.

II.   LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is

1 more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

III. ANALYSIS

Plaintiff argues that the ALJ erred in: finding that his impairments were not continuously severe and disabling for twelve months; giving little weight to his physicians' opinions regarding his physical and mental impairments; finding that his testimony was not credible; and finding that he retained the RFC to perform his past relevant work.

    A. <u>The ALJ Did Not Err in Noting that the Evidence as to the Persistence of Severity of Plaintiff's Impairments for a Continuous 12-Month Period Was Unconvincing</u>.

Plaintiff argues that the ALJ found that plaintiff's upper extremity limitations and mental impairments were not disabling for any continuous 12-month period, and that this finding was erroneous and unsupported by the medical evidence.

As noted above, the ALJ found at step two that plaintiff had the severe impairments of bilateral carpal tunnel syndrome, bilateral hand osteoarthritis, posttraumatic left median neuropathy, right knee Baker's cyst, right shoulder impingement syndrome, major depression, and posttraumatic stress disorder. AR 576. Later in his decision, the ALJ wrote that plaintiff had "severe upper extremity limitations, though the purported severity of his pain is not shown to have been that severe (i.e., disabling) throughout the entire period of the alleged disability–or at least to have persisted over any continuous 12-month period. There clearly have been periods of

4

worsening, for example around the time before and after his carpal tunnel surgery...In any event, his upper extremity impairments are clearly severe and impose significant limitations as found here." AR 580.  As noted above, the ALJ ultimately included the following limitations in plaintiff's RFC: "limited to lifting and carrying from 5 pounds frequently to 10 pounds occasionally in the right hand, no climbing of ladders, ropes or scaffolds, occasional stooping, crouching, crawling, and kneeling, and frequent fine and gross manipulations." *Id.* at 578.

Similarly, with respect to plaintiff's mental impairments, the ALJ wrote regarding treating physician Dr. Heitzman's report, "Although at that particular point in time the claimant may have been experiencing a marked worsening in his mental status, the record fails to show that it persisted for at least 12 continuous months." *Id.* at 581.  The ALJ included the following mental impairment limitation in plaintiff's RFC: "the claimant was moderately limited in his capacity to interact appropriately with the public, respond appropriately to work pressures in a usual work setting, and to changes in routine work settings." *Id.* at 578.

Plaintiff argues that no doctor found that his impairments were not severe for twelve continuous months, and therefore the ALJ's findings are not supported by substantial evidence. Dckt. No. 16-1 at 24-26.  Plaintiff misapprehends the ALJ's finding.

It is true that no doctor specifically opined that the level of severity of plaintiff's upper extremity impairments and mental impairments was not sustained over a continuous twelve-month period.  However, the ALJ did not make a finding to the contrary.  That is, the ALJ did not find that plaintiff's impairments were *not* severe at any point during 12-month period. Instead, the ALJ merely noted that reports of the severity of plaintiff's impairments only reflected plaintiff's condition at that time, and did not convincingly prove that the severity of plaintiff's impairments had persisted continuously at that level of severity for a continuous 12-month period.  In other words, the ALJ did not make a finding that plaintiff's impairments were non-severe at any time; rather, he explained that the evidence was lacking in that it did not convincingly demonstrate that plaintiff's impairments persisted in their severity level for a

5

1  continuous 12-month period.  Plaintiff may disagree with the ALJ's interpretation of the
2  evidence, but in the absence of reversible error, the ALJ is responsible for resolving ambiguities
3  in the evidence.  *See Edlund*, 253 F.3d at 1156.

        B.      <u>The ALJ Failed to Provide Reasons for Rejecting Limitations Assessed by Treating and Examining Physicians.</u>

6        Plaintiff also argues that the ALJ erred in weighing the medical evidence.  As discussed
7  below, the court finds that the ALJ did err in failing to set forth specific, legitimate reasons for
8  rejecting his treating and examining physicians' opinions.  The weight given to medical opinions
9  depends in part on whether they are proffered by treating, examining, or non-examining
10 professionals.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  Ordinarily, more weight is
11 given to the opinion of a treating professional, who has a greater opportunity to know and
12 observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1295 (9th Cir. 1996).
13 To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its
14 source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical
15 findings support the opinions.  An ALJ may reject an uncontradicted opinion of a treating or
16 examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.
17 In contrast, a contradicted opinion of a treating or examining professional may be rejected for
18 "specific and legitimate" reasons, that are supported by substantial evidence.  *Id.* at 830.  While a
19 treating professional's opinion generally is accorded superior weight, if it is contradicted by a
20 supported examining professional's opinion (e.g., supported by different independent clinical
21 findings), the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir.
22 1995) (*citing Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).  However, "[w]hen an
23 examining physician relies on the same clinical findings as a treating physician, but differs only
24 in his or her conclusions, the conclusions of the examining physician are not 'substantial
25 evidence.'"  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).
26 ////

6

1. <u>Dr. Nickel and Dr. Colon</u>

Dr. Nickel was plaintiff's treating physician. In 2005, Nickel opined that plaintiff could frequently lift less than 5 pounds, occasionally lift 5-20 pounds, and never lift more than 20 pounds, and that he was unable to work an eight-hour day five days a week because of "limited use [of left] arm/hand." *Id.* at 168. Nickel checked a box indicating that plaintiff could perform "light" work. *Id.* at 169. *See also id.* at 375-77. Two years later, on June 20, 2007, Nickel opined that plaintiff was "unable to lift, push, or pull no more than 5 lbs. with either hand. It is felt that he is able to perform activities with his hands within these limits for 15 minutes per hour in an 8-hour workday." *Id.* at 494.

Dr. Colon, who examined plaintiff on behalf of the Social Security Administration, wrote on December 1, 2007, that "the amount of weight the claimant can lift or carry, both frequently and occasionally, is less than 10 pounds, and the limitation is justified secondary to bilateral carpal tunnel syndrome and osteoarthritis." *Id.* at 498. He further opined that "The claimant has manipulative limitations on reaching, handling, feeling, grasping and fingering secondary to bilateral carpal tunnel syndrome." *Id.* On the same day, Colon completed a Medical Source Statement in which he opined that plaintiff could lift and carry up to 20 pounds occasionally (which is defined as "up to 1/3" of the day), as well as handle, finger, feel, push/pull, and reach overhead with the right hand occasionally. *Id.* at 500. Colon further opined that the limitations assessed were first present "years ago" and checked "yes" in response to the question "have the limitations you found above lasted or will they last for 12 consecutive months?" *Id.* at 505.

As noted above, the ALJ found that plaintiff "was limited to lifting and carrying from 5 pounds frequently to 10 pounds occasionally in the right hand" and that he could not perform "frequent fine and gross manipulations." *Id.* at 578. The ALJ did not adopt the opinions of Dr. Nickel and Dr. Colon regarding the functional limitations stemming from plaintiff's upper extremity impairments. The ALJ wrote:

////


> Clearly, the claimant suffered severe trauma to his left upper extremity from a dog bite and carpal tunnel syndrome affecting both extremities, which has resulted in some discomfort, numbness and tingling, and limited use. Although his symptoms and limitations were markedly worse at the outset he underwent treatment, which restored his functioning to within the parameters found here. Various treating and examining sources have offered markedly divergent assessments: a March 2005 medical source statement from then-treating physician L. Nickel, M.D., indicates a light functional capacity with no limitations in standing, walking, or sitting, and an occasional lifting/ carrying capacity up to 20 pounds but less than 5 pounds frequently (Exs. 7F, 12F); a State Agency assessment of March 2004 is similar but limits left hand lifting to 10 pounds and left hand manipulations to only one hour a day (Ex. 6F); another State Agency assessment of August 2006 indicates similar limitations except it allows for occasional handling bilaterally (Ex. 17F); a later assessment from Dr. Nickel of June 2007 indicates the claimant was presently limited to lifting, pushing, or pulling more than 5 pounds (Ex. 22F); and a December 2007 assessment from an examining consultant specializing in physical medicine found the claimant capable of occasional (but no frequent) lifting and carrying up to 20 pounds, continual left hand reaching with occasional right hand reaching and bilateral occasional handling, fingering, feeling, and pushing/ pulling (Ex. 24F). Thus, the undersigned has attempted to resolve these assessments in arriving at a reasonably supported residual functional capacity while taking into account the medical evidence and the pertinent non-medical evidence.

AR 579-80.

Plaintiff argues that the ALJ disregarded Nickel's opinion that plaintiff had the capacity to lift, push, or pull no more than five pounds and for no more than 15 minutes per hour in an eight-hour work day. *See id.* at 494. Plaintiff contends that the ALJ was required to "specifically resolve the conflict between [Nickel's opinion] and Dr. Colon's determination that he was limited in these activities to occasional or one third of an eight hour work day." Dckt. No. 16-1 at 27.

Defendant does not respond to plaintiff's arguments regarding the ALJ's assessment of Nickel and Colon's opinions. *See* Dckt. No. 19 at 9. Instead, defendant writes, "An ALJ may disregard a physician's opinion whether or not that opinion is contradicted," and that "an RFC finding is not dependent on any particular medical opinion, even that of a treating physician . . . The ALJ did exactly what he was charged with doing, weighing the record evidence as a whole to determine Plaintiff's supported functions." *Id.*

////

8

Clearly, the ALJ is charged with weighing the record evidence as a whole to determine a claimant's RFC. But it is also well established that an ALJ must provide clear and convincing reasons for rejecting uncontradicted treating and examining doctors' opinions, and specific and legitimate reasons for rejecting even contradicted opinions of such professionals. As the ALJ did not credit Nickel's opinion that plaintiff was limited to lifting, pushing, or pulling no more than five pounds and for no more than 15 minutes per hour in an eight-hour work day, he was required to provide specific and legitimate reasons for rejecting the opinion. Similarly, the ALJ was required to provide clear and convincing reasons for rejecting Colon's uncontradicted opinion that plaintiff was limited in these activities to occasional or one third of an eight hour work day. But the ALJ provided no reasons for rejecting these opinions. This section of the decision is devoid of analysis; the ALJ merely partially lists some of the pertinent parts of the various medical professionals' opinions, states that he has taken them into consideration, along with other pertinent evidence, and announces his RFC determination. Thus, the ALJ erred in evaluating Dr. Nickel and Dr. Colon's opinions.

The error cannot be said to be harmless. *See Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) (an ALJ's error regarding witness testimony is not harmless unless the reviewing court can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination). A reasonable ALJ relying on the medical opinions Dr. Nickel and Dr. Colon's, particularly when viewed in light of the questioning and testimony of the vocational expert, could have reached a different determination. The vocational expert testified that if plaintiff was limited to lifting, pushing, or pulling no more than five pounds and for no more than 15 minutes per hour in an eight-hour work day, he could not perform his past work or any of the "light" jobs that the vocational expert specifically gave as examples of jobs plaintiff could perform under the ALJ's hypothetical. *See* AR at 792-93. The vocational expert was not asked whether the no-more-than-five-pounds and no-more-than-15-minutes-per-hour limitations would preclude the performance of all

"sedentary" jobs as well as all "light" jobs. Many sedentary jobs require fine dexterity, and the ALJ determined that plaintiff could not perform "frequent fine and gross manipulations." *See* 20 CFR. § 416.967 ("If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity"); AR 578. Thus, this court cannot confidently conclude that crediting Dr. Nickel's opinion would not have resulted in a different disability determination. The case must be remanded for further proceedings.

### 2. Dr. Heitzman

In addition, the ALJ erred in improperly disregarding the uncontradicted opinion of plaintiff's treating psychiatrist, Dr. Heitzman. In March 2005 Heitzman completed a form stating that plaintiff had major depression, PTSD (after witnessing a massacre in Mexico in 1968), and a GAF score of 30. *Id.* at 171. Heitzman marked "poor or none" with respect to plaintiff's ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, maintain attention/concentration, understand, remember and carry out complex and simple jobs, relate predictability in social situations, demonstrate reliability, and behave in an emotionally stable manner. *Id.* Heitzman opined that plaintiff was "avoidant fearful," had "flashbacks depression," and "severe PTSD." *Id.* at 172-73. In June 2005 Heitzman wrote in his chart notes that plaintiff slept poorly and had appetite disturbance, and that there was no change from the last visit. *Id.* at 212.

On July 18, 2007, Heitzman wrote:

> Mr. Cordoba would be unable to work 1-2 days per month. He is internally preoccupied with thoughts of suicide. He has constant intrusions of unwanted traumatic memories deriving from his witnessing a massacre in Mexico. This results in inability to focus and concentrate and he has constant urges to flee when these memories occur. He is on edge and feels others watch him or wish him harm even if he is sitting unobserved in a quiet empty room. Even the most limited interactions with supervision, even by telephone would provoke a severe episode of rage. He is unreliable and unable to work even 1-2 days a month under any circumstances.

*Id.* at 495.

As noted above, the ALJ found that plaintiff was "moderately limited in his capacity to interact appropriately with the public, respond appropriately to work pressures in a usual work setting, and to changes in routine work settings." *Id.* at 578.  The ALJ found that due to his mental impairments, plaintiff had moderate restriction in activities of daily living, moderate difficulties in social functioning, and mild difficulties maintaining concentration, persistence or pace.  Thus, the ALJ rejected some of Heitzman's restrictions.

The ALJ rejected Heitzman's opinion that plaintiff was 100% disabled "and similar assessments," as "that level of severity is not reflected in the treating source's progress records, which as noted above contained few mental status abnormalities but rather contain primarily a recitation of the claimant's subjective complaints." *Id.*  The ALJ noted that an opinion that an individual is disabled is not dispositive, as the ultimate decision regarding disability is reserved for the ALJ. *Id.*  The ALJ wrote:

> As for the opinion evidence regarding the claimant's mental functional capacity, the undersigned has also carefully considered Dr. Heitzman's various opinions–and particularly the opinion that the claimant cannot work 1 to 2 days a month (Ex. 23F).  Initially, being unable to work for a day or two per month is not necessarily fatal to the ability to perform substantial gainful activity.  However, being unable to work even one day a month would obviously preclude any conceivable job situation that would represent substantial gainful activity.  However, the undersigned cannot accept the July 2007 assessment in that regard because it lacks any reasonable support in the record.  Although at that particular point in time the claimant may have been experiencing a marked worsening in his mental status, the record fails to show that it persisted for at least 12 continuous months.  Indeed, even Dr. Heitzman's own chart notes fail to demonstrate that level–or any level–of severity (See, Ex. 21F).  Rather, the physician's mainly handwritten chart notes set forth the claimant's own statements and Dr. Heitzman's medication regiment. [sic] Likewise, the physician's other medical source statements opining the claimant essentially has no useful functioning in most areas of occupational functioning, cannot be accepted due to lack of corroboration by clinical signs or laboratory findings (See, Exs. 8F, 13F, 19F).  Rather, such assessments were based on the claimant's assertion of witnessing a massacre in Mexico in the late 1960s–rather than on any observed clinical abnormalities (See, Ex. 13F/1).  Indeed, although the undersigned does not dispute that the claimant did witness such events he was nevertheless able to work successfully for many years thereafter.

*Id.* at 581.

////

Plaintiff correctly argues that Heitzman's opinion should be considered uncontradicted. Dckt. No. 16-1 at 28. Plaintiff has never been examined by a Social Security administration mental health professional. *Id.* Dr. Walter, the state agency's non-examining consultant, never offered an opinion regarding plaintiff's ability to interact appropriately with the public, supervisors and coworkers, but left these sections of his "Psychiatric Review Technique" blank. *Id.* (citing AR 458, 463). In addition, even if Dr. Walter had disagreed with all of Dr. Heitzman's opinions, his opinions would not constitute substantial evidence that would justify rejecting Heitzman's opinions absent Walter's own independent clinical data on which to base his opinions. He lacked any such independent data and instead merely reviewed the existing medical records in the file. *See Orn*, 495 F.3d at 632 (holding that the opinion of an examining physician which relies on the same clinical findings as a treating physician's opinion cannot constitute "substantial evidence" to warrant rejecting the treating physician's opinion). Thus, the ALJ was required to provide clear and convincing reasons for rejecting Heitzman's opinions.

The ALJ gave the following reasons for rejecting Heitzman's opinions: Heitzman's opinion that plaintiff could not work even one or two days a month lacked any reasonable support in the record; Heitzman's chart notes failed to demonstrate that plaintiff's mental impairments were "at that–or any level–of severity"; Heitzman's chart notes relayed the plaintiff's subjective complaints (and the ALJ separately found that plaintiff was not credible); and Heitzman's statements that plaintiff was unable to work was based on plaintiff's testimony regarding a massacre he had witnessed in the 1960s, even though plaintiff was able to work for years after witnessing the massacre.

These reasons are not clear and convincing. Regarding the first reason, as the ALJ recognized, Heitzman's statement that plaintiff could not work 1-2 days a month was ambiguous–it could be interpreted to mean that plaintiff would miss 1-2 days of work each month, or it could mean that plaintiff was unable to work even 1-2 days a month. The ALJ interpreted Heitzman's statement to mean the latter, and then rejected it as incredible. But the

ALJ did not consider the limitations imposed by the alternative interpretation; that is, the ALJ cursorily wrote "being unable to work for a day or two per month is not necessarily fatal to the ability to perform substantial gainful activity," but did not obtain testimony from the VE regarding the effect of missing 1-2 days of work each month in light of the other functional limitations.

Similarly, the ALJ's assertions that Heitzman's chart notes do not support his ultimate opinion, and that his opinion is not supported by the medical evidence, are not clear and convincing. The ALJ cites exhibit 21F, which contains many pages of records written by Dr. Phillippi as well as Dr. Heitzman. Plaintiff's brief summarizes some of these records:

> Records from Butte County Department of Behavioral Health (Tr. 210-227), dated 6-5-01 to 6-6-05, show that when interviewed on 6-5-01 plaintiff reported having a history of severe trauma after witnessing a massacre of students in Mexico City in 1968 when he was four years old, and he continued to have a lot of flashbacks and anger, and the Diagnosis was PTSD with G.A.F. score of 65 (Tr. 227). The record for 6-6-01 shows that he reported having decreased appetite with weight loss, anhedonia, decreased concentration, decreased energy, feelings of worthlessness, recurrent thoughts of death with two prior attempts at suicide, and he admitted to using alcohol, and the diagnostic Impression was "Major depressive disorder, recurrent; PTSD; (and) Poly substance dependence" with a G.A.F. score of 55 (Tr. 256).
>
> ...
>
> An intake interview on 3-9-05 shows that plaintiff reported having PTSD with flashbacks, and the diagnostic Assessment was "PTSD" with a G.A.F. score of 39 (Tr. 223). An Adult Assessment form (Tr. 317-320), dated 3-10-05, shows that plaintiff reported having weight loss of 50 pounds, PTSD and depression, arm injury, difficulty sleeping and eating, nightmares, flashbacks, night sweats, and thoughts of suicide (Tr. 218), as well as having a history of abuse and torture from his father (Tr. 219), and Mental Status examination revealed that his affect and mood was depressed, and he was easily distracted and had poor concentration (Tr. 219-220), and Dr. George Heitzman would be his physician and M. Phillipi would be his clinician, and the Diagnosis was "Major Depression Severe; (and) PTSD" (Tr. 217). This form noted that plaintiff reported having nerve pain in his left forearm/wrist, and his G.A.F. score was currently 30, and indication was made that functioning was severe in the Home and Community due to isolation and feeling overwhelmed, and interaction with Peers was severe, and he was unable to Work (Tr 217). Dr. Heitzman indicated in a Medical Assessment of Ability to Do Work-Related Activities - Psychological form, dated 3-10-05, that plaintiff had a Diagnosis of Major Depression and PTSD with a G.A.F. score of 30, and he had "poor" abilities to Relate to co-workers, to Deal with the public, to Interact with supervisors, to Deal with work stresses, to Maintain

attention/concentration, to Understand/remember/carry out complex and simple job instructions, to Relate predictably in social situations, to Demonstrate reliability, and to Behave in an emotionally stable manner, as a result of having flashbacks, depression and increasing startle, and severe PTSD (Tr. 171-173). Dr. Heitzman and M. Phillipi, indicated in a report, dated 4-6-05, that plaintiff was tearful and had a Diagnosis of PTSD (Tr. 214, 222). The record for 5-4-05 shows that plaintiff reported that the medication of Cymbalta had improved his depression and pain, and he appeared to be brighter and more hopeful and positive (Tr. 214). Dr. Heitzman indicated on 6-6-05 that plaintiff continued to have poor sleep and PTSD (Tr. 212). The treatment record, dated 6-6-05, shows that plaintiff reported that his depression was better with Cymbalta, but this medication also caused him to lose his appetite, and Dr. Heitzman added Zyprexia (Tr. 211).

...

Records from Butte County Department of Behavioral Health (Tr. 464-484), dated 4-10-06 to 5-3-07, include a Yearly Assessment Update, dated 4-10-06, which revealed that plaintiff reported that he continued to have the same symptoms of severe depression, suicidal thoughts, posttraumatic stress, nightmares, flashbacks and anhedonia, and the diagnoses remained the same as set forth in the 3-10-05 assessment, but the GAF score increased to 40 with severe levels of functional limitations in Home, Community, Peers and Work (Tr. 484). Subsequent records show that plaintiff continued to be treated for depression, poor sleep due to nightmares, thoughts of suicide, and anger, and notation was made on 1-4-07 that he was going to go to anger management training (Tr. 471), but notation was made on 3-22-07 that he had been convicted of committing battery (Tr. 467, 229-300). Dr. George Heitzman stated in a Medical Assessment of Ability to Do Work-Related Activities (Mental) form, dated 5-16-07, that due to "Intrusive thoughts, flashbacks and internal preoccupation with suicide, suspicious of strangers and anxiety (post traumatic stress disorder)" plaintiff continued to have a "poor" ability to Make Occupational Adjustments, and although he indicated that plaintiff had a "fair" ability to understand/remember/ carry out job simple job instructions, he stated that due to plaintiff's "depression and chronic irritability refractory to psychotropic medication, very explosive and suspicious," plaintiff had a "poor" ability to "Behave in an emotionally stable manner, Relate predictably in social situations, (and) Demonstrate reliability" (Tr. 446-447).

...

Records from Butte County Department of Behavioral Health (Tr. 642-681), dated 3-1-07 to 7-2-09, show that plaintiff continued to be treated for post-traumatic stress disorder and depression. These records include a Yearly Assessment Update, dated 3-1-07, which show that plaintiff continued to have diagnoses of post-traumatic stress disorder and major depression with a GAF score of 40 and severe limitations in regards to Home, School, Community, Peers and Work (Tr. 679). These records show that on 2-5-09 plaintiff reported having increased sleep disturbance, poor appetite, increased depression with increased suicidal ideation, increased nightmares and severe flashbacks, and he was observed to be more depressed and tearful (Tr. 642-643). A Yearly Assessment Update, dated 2-5-09, shows that plaintiff continued to have a diagnosis of

> posttraumatic stress disorder with a Axis V or GAF score of 30 in the past twelve months and 39 currently with severe depression and nightmares and panic attacks, and he had severe limitations in regards to Home, Community, Peers and Work due to poor sleep, isolation, social phobia, and panic attacks (Tr. 751). The treatment record, dated 7-2-09, shows that plaintiff was observed to be very upset and reported having nightmares, and he was observed to be crying and having suicidal ideation (Tr. 747). Dr. Heitzman indicated in a Medical Report, dated 4-2-09, that plaintiff had a Diagnosis of "PTSD - Severe" that prevented or substantially reduced his ability to work full time at his customary job and to care for children (Tr. 749).

Dckt. No. 16-1 at 14-21.  Thus, the mental health treatment records do contain objective findings–depressed affect and mood, distraction, sleeplessness, weight loss, nightmares, and tearfulness–to support Heitzman's opinions.  In the absence of any analysis of any specific piece of medical evidence, the ALJ's bare statements that Heitzman's "chart notes fail to demonstrate that level–or any level–of severity" and his opinions "cannot be accepted due to lack of corroboration by clinical signs or laboratory findings" are neither clear nor convincing.

Neither does the ALJ's assertion that Heitzman's opinions are incredible because they are based on the plaintiff's testimony of witnessing a massacre in Mexico in the late 1960s, after which he worked for many years, constitute a clear and convincing reason for rejecting Heitzman's opinion.  The ALJ apparently assumed that the symptoms of PTSD would not have a greater effect on plaintiff's ability to work years after the causal event.  But there is no medical evidence to this effect in the record.  *Cf.* Merck Manual of Diagnosis and Therapy, 1501 (Nineteenth Ed. 2011) ("Sometimes the onset of symptoms [of Posttraumatic Stress Disorder] is delayed, occurring many months or even years after the traumatic event").  The ALJ is not a medical expert on PTSD and may not substitute his assumed expertise for medical evidence.

Finally, as discussed below, the ALJ erred in finding that plaintiff was not credible, and therefore Heitzman's reliance on plaintiff's subjective complaints in forming his opinions does not constitute a clear and convincing reason for rejecting his testimony.

////

////

## C. Credibility

In general, the ALJ determines whether a disability applicant is credible, and the court defers to the ALJ's discretion if the ALJ used the proper process and provided proper reasons. *See*, *e.g.*, *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). If there is objective medical evidence of an impairment, the ALJ then may consider the nature of the symptoms alleged, including aggravating factors, medication, treatment and functional restrictions. *See id.* at 345-47. The ALJ also may consider: (1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the applicant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *see generally* SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity and effect of symptoms, and inconsistencies between testimony and conduct also may be relevant. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). A failure to seek treatment for an allegedly debilitating medical problem may be a valid consideration by the ALJ in determining whether the alleged associated pain is not a significant nonexertional impairment. *See Flaten v. Secretary of HHS*, 44 F.3d 1453, 1464 (9th Cir. 1995). The ALJ may rely, in part, on his or her own observations, *see Quang Van Han v. Bowen*, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. *Marcia v. Sullivan*, 900 F.2d 172, 177 n.6 (9th Cir. 1990). "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear

and convincing." *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).

At the hearing, plaintiff testified that he had a driver's license, but had last operated a motor vehicle two years before, when he drove to the doctor because no one could take him that day. AR 761. He stated that he was on probation for battery for hitting someone with a dog leash wrapped around his arm. *Id.* at 768-69 (plaintiff's testimony); 299 (complaint charging plaintiff with misdemeanor battery). Plaintiff testified that he could dress himself and could put on slip-on shoes. *Id.* at 772-73. He could brush his teeth once a week with a "little electronic toothbrush" "for one minute." *Id.* at 773. He needs help undoing his belt buckle and sometimes needs help shaving. *Id.* at 773-74. He testified that he does not make his bed or do laundry and "I don't do anything" during the day. *Id.* at 771, 75, 77.

Plaintiff testified that he had no friends, hobbies or social activities. *Id.* at 785-86. He testified that he was angry all of the time and frequently had emotional blow-ups. *Id.* at 787. He testified that he could only stand for about 20 minutes and walk only a couple of blocks due to his Baker's cyst on his leg. *Id.* at 788. He stated that he "cannot sit for too long because then my back will start hurting." *Id.* He stated that he could not lift or carry more than five pounds on either side because of his osteoarthritis, carpal tunnel, and weakness in his hands. *Id.* He could only grasp an object for 30 seconds at a time due to increasing numbness. *Id.*

The ALJ wrote "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 579. After discussing various doctors' opinions regarding plaintiff's upper extremity limitations, the ALJ wrote:

> In terms of the claimant's alleged inability to perform more than short periods of standing, walking, or even sitting, the undersigned must reject such assertions in view of the present record showing that during the period of his alleged disability he was able to drive and to assault another motorist–based on his own testimony (See, Ex. 11B). He thereafter completed an anger management program. (Ex. B-32E). In any event, his activities referenced in the record at various times are inconsistent with his assertions of disabling pain and other symptoms and an

17

>inability to perform a wide range of light work-related functions (i.e., the residual functional capacity found here). . . .
>
>. . . Regarding his purported medication side effects, while drowsiness would be a reasonable consequence it has not been documented to exist to that degree in the record–at least for any significant period that it amounted to a chronic impairment affecting his work capacity for more than brief periods. For example, the fact that he maintained the mental alertness to drive during this period undermines the assertion of persistent drowsiness (See, e.g., Ex. 11F/3). Though he has denied driving a motorcycle he has not disputed driving a car during this period. Dr. Heitzman's chart notes also indicate the claimant was not experiencing any medication side effects, though an April 2007 chart note indicates he was sleep walking apparently from one of his medications–which was discontinued (See, Ex. 21F/7). Further, as described by the claimant in a prehearing statement he was able to cook, clean, do laundry and other light activities for up to an hour, which is [sic] (Exs. 3E).

*Id.* at 580.

Thus, the ALJ gave the following reasons for finding plaintiff not entirely credible: his testimony regarding his standing, walking and sitting limitations and his drowsiness was inconsistent with his ability to drive and assault a motorist; and his "activities referenced in the record at various times," including his ability to do light household chores for up to an hour, are inconsistent with his testimony.

As to the first reason, the ALJ's statement that plaintiff was able to drive and assault another motorist grossly mischaracterizes the record. Plaintiff testified that he drove one time two years before the hearing to get to a doctor's appointment when no one else could take him. The ALJ did not ask him how long it took to drive to the doctor's office. While plaintiff testified at the hearing that he could not sit for "too long," the ALJ did not ask him how long that was, or explain how that was inconsistent with plaintiff's admission that he had driven once to his doctor's office. There is no evidence in the record that plaintiff assaulted a motorist. Rather, plaintiff testified that he hit someone with a dog leash wrapped around his arm. This testimony does not appear to be inconsistent with his claimed standing, walking and sitting limitations and statement that he is persistently drowsy. This reason falls far short of clear and convincing.

////

As to the ALJ's second reason, he does not explain what "activities referenced in the record at various times" are inconsistent with plaintiff's testimony. Without further explanation or citations to specific evidence, this reason is unconvincing. While plaintiff's admission in his prehearing statement that he could cook, clean, do laundry and other light activities for up to an hour is different than his testimony at the hearing that he doesn't do anything during the day,[2] the ability to do up to an hour of light housework does not preclude plaintiff from being disabled for social security purposes.

Thus, the ALJ erred in failing to provide clear and convincing reasons for finding plaintiff's testimony not credible.

Because the case must be remanded for further proceedings based on the ALJ's failure to analyze the medical opinions under the proper legal standards and provide clear and convincing reasons for finding plaintiff's testimony not credible, the court does not address plaintiff's additional arguments regarding the vocational expert's testimony and the assessment of plaintiff's RFC.

IV. CONCLUSION

The court finds that the ALJ erred in failing to provide the legally required reasons for rejecting treating and examining physicians' opinions and for finding plaintiff not credible. Therefore, IT IS ORDERED that:

    1. Plaintiff's motion for summary judgment is granted;

    2. The Commissioner's cross-motion for summary judgment is denied;

    3. The Clerk is directed to enter judgment in Plaintiff's favor; and

////

////

////

---

[2] This testimony was given in the following brief colloquy: ALJ: "What type of things do you do during the day?" Plaintiff: "I don't do anything." AR 777.

19

4. This action is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED: September 29, 2011.

/s/ Edmund F. Brennan
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE